**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| ASIAN AMERICANS ADVANCING JUSTICE–ATLANTA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Case No. |
| BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State; REBECCA SULLIVAN, in her official capacity as the Vice Chair of the Georgia State Election Board; DAVID WORLEY, in his official capacity as a member of the Georgia State Election Board; MATTHEW MASHBURN, in his official capacity as a member of the Georgia State Election Board; and ANH LE, in her official capacity as a member of the Georgia State Election Board, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| Defendants. | ) ) ) | |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff ASIAN AMERICANS ADVANCING JUSTICE–ATLANTA ("Advancing Justice–Atlanta") files this Complaint for Declaratory and Injunctive Relief against Defendants BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State (the "Secretary"); REBECCA SULLIVAN, in her official capacity as the Vice Chair of the Georgia State Election Board; and DAVID WORLEY, MATTHEW MASHBURN, and ANH LE, each in their official capacity as a member of the Georgia State Election Board, and allege as follows:

### I.      INTRODUCTION

1.      Georgia voters' performance in the 2020 election cycle was a triumph for American democracy. In the face of numerous obstacles, including a global pandemic, Georgia held a safe and secure election, in which millions of Georgians were able to make their voices heard. Asian American and Pacific Islander ("AAPI") voters personified Georgia's successes. AAPI voter

1

turnout in Georgia nearly *doubled* between the 2016 and 2020 elections. The widespread availability of absentee ballots, also known as mail-in ballots, played a key role in this record turnout. During the 2020 election cycle, AAPIs voted by mail at a higher rate than any other ethnic group in Georgia. Local election officials and civic groups, such as Advancing Justice–Atlanta, played a key role in helping AAPI voters exercise their rights to participate in the democratic process.

2.      Rather than celebrate and build upon these successes, the Georgia legislature has emphatically rejected them. Senate Bill 202 ("SB 202"), adopted in the immediate aftermath of record turnout from AAPI and other voters of color, systematically undermines or outright prohibits the election procedures that helped facilitate AAPI participation in the 2020 Presidential election ("General Election") and subsequent 2021 U.S. Senate runoffs ("Runoff Elections"). SB 202 perpetrates explicit and per se voter suppression. In particular, SB 202 erects new obstacles to voting that burden the rights of AAPI voters and other voters of color.

3.      Unfortunately, these tactics are not unfamiliar. Georgia's long history of racially discriminatory election procedures is well-established, and the rhetoric and circumstances around SB 202's passage place the bill squarely in the lineage of prior attempts to suppress non-white voters. But from poll taxes to "white primaries" to literacy tests, courts have rejected past efforts to deny Georgia voters of color equal access to the democratic process. SB 202 should meet the same fate on the scrap heap of history.

4.      SB 202's discriminatory overhaul of Georgia's election procedures is particularly harmful to AAPI voters with respect to the numerous ways in which it restricts absentee voting. SB 202 dramatically reduces the time during which AAPI voters may request and return absentee ballots, eliminates drop-off locations, bars local and state officials from proactively mailing absentee applications, imposes burdensome new voter identification requirements, and criminalizes certain handling and return of completed absentee ballot applications.

5.      No community will feel SB 202's baseless restrictions on absentee voting more forcefully than AAPI voters. During the General Election, more than half (54%) of Georgia's

AAPI voters cast their ballots remotely, as compared to 35% of all voters and 31% of white voters. Other communities of color also use absentee mail voting and will be impacted; 41% of Black voters and 33% of Latine voters cast absentee ballots in the General Election. Similarly, during the Runoff Elections, more than 42% of AAPI voters cast absentee ballots, as did 35% of Black voters, as compared to 30% of all voters on average and 26% of white voters.

6.     As these statistics reflect, absentee ballots facilitate greater AAPI participation in Georgia's elections. The Asian American community has a higher proportion of foreign-born residents compared to other racial groups in the United States, and limited English proficiency ("LEP") remains common in the Georgia Asian American community. Newly naturalized citizens, first time voters, and LEP voters often need more time to review their ballot materials and/or seek assistance during the voting period from persons authorized under Georgia law. Absentee voting allows these voters crucial time and resources that may be less available or accessible through in-person voting.

7.     The hurdles that absentee voting aims to overcome have only been exacerbated for the AAPI community by the COVID-19 pandemic. A recent study indicated that AAPI communities are more likely to be concerned about the pandemic than the rest of the public. Absentee voting provides AAPI voters a means of exercising their democratic rights without subjecting themselves to the potential health risks of large crowds at polling places.

8.     The COVID-19 pandemic has also contributed to a surge in anti-AAPI violence, due in part to use of the racist slurs like "China virus" or "kung flu" to refer to coronavirus. Incidents of violence or harassment against the AAPI community are not a new phenomenon but jumped by nearly 150% in 2020. Nearly 3,800 anti-AAPI hate incidents were reported from March 19, 2020 to February 28, 2021, the majority of which were reported by AAPI women. This alarming jump in threats and harassment has created a climate in which many Asian Americans fear for their safety in unfamiliar public places, further complicating the efforts of Asian American voters in 2020 and 2021.

9.      These fears were heartbreakingly realized on March 16, 2021, when a white gunman murdered six Asian American women at Asian-owned spas in the Atlanta area. In the wake of that mass shooting, and in light of frequent and continuing reports across the country of AAPI-targeted assaults and killings, many Georgia AAPI voters fear leaving their homes. Given this ongoing spate of anti-Asian violence, the accessibility of absentee voting has taken on particular importance for the AAPI community.

10.     There are ample justifications for maintaining the absentee voting procedures Georgia employed in the 2020 election cycle. Despite having the most scrutinized state election count in a generation, Georgia election officials found no significant irregularities or fraud in any method of voting, including the widespread use of absentee voting. Claims disputing the validity of absentee ballots have been repeatedly rejected by Georgia officials and the courts. The most recent elections were, in the words of Secretary Raffensperger, "secure, reliable, and efficient."

11.     In contrast to the well-documented integrity of Georgia's most recent elections, SB 202's sponsors have put forth no credible evidence establishing a need for their sweeping overhaul of Georgia's election procedures. Through a rushed and closed-door legislative process, the state legislature ignored numerous public outcries warning that the bill would disproportionately impact Georgia's voters of color. While the state legislature chose to disregard the discriminatory effects of SB 202, the courts should not.

12.     SB 202's challenged provisions deny AAPI voters a full and equal opportunity to participate in the political process. By purposeful intent and resulting impact, the challenged provisions violate both Section 2 of the Voting Rights Act ("VRA") of 1965, and the rights of voters of color under the Fourteenth and Fifteenth Amendments to the United States Constitution.

13.     The challenged provisions further violate the right to vote of all Georgia voters under the First and Fourteenth Amendments to the United States Constitution. Any state restriction on the right to vote, no matter how slight, "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (quotation marks omitted). In addition to its impermissible

discriminatory impacts, SB 202 imposes severe burdens on all voters' fundamental rights, without any relevant and legitimate state interest to justify them.

14.     After the record-setting turnout in the 2020 election cycle from voters of color, including AAPI voters, SB 202 is an obvious attempt to roll back the clock to the racially-restrictive voting practices of Georgia's discredited past. That attempt should be categorically rejected. Accordingly, this Court should declare the challenged sections of SB 202 unlawful and unconstitutional and permanently enjoin their enforcement.

## II.     JURISDICTION AND VENUE

15.     Plaintiff brings this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

16.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343, because the matters in controversy arise under the Constitution and laws of the United States.

17.     This Court has personal jurisdiction over the Defendants, who are sued in their official capacities only.

18.     Venue is proper in the U.S. District Court for the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b)(2) and under Local Civ. R. 3.1 because, inter alia, several defendants reside in this district and this division and a substantial part of the events that gave rise to Plaintiff's claims occurred in this judicial district. Plaintiff also operates within this district and division.

19.     This Court has the authority to enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## III.     PARTIES

20.     Plaintiff ASIAN AMERICANS ADVANCING JUSTICE–ATLANTA ("Advancing Justice–Atlanta") is a nonpartisan, nonprofit organization founded in 2010 and located in Norcross, Georgia. Advancing Justice–Atlanta is dedicated to protecting the civil rights of AAPIs and other immigrant and refugee communities in Georgia through policy advocacy, civic

engagement and organizing, legal services, and litigation. As part of its civic engagement and organizing work, Advancing Justice–Atlanta engages in voter registration, get out the vote ("GOTV"), and election protection activities in local, state, and federal elections, with a primary focus on AAPI communities. Advancing Justice–Atlanta conducts all of its election-related activities in English and multiple non-English languages, and its GOTV efforts for the June 2020 primary, General Election, and Runoff Elections included outreach to thousands of voters in Korean, Chinese, Vietnamese, Hindi, and Spanish encouraging them to vote early in person or by mail. Advancing Justice–Atlanta also assists voters navigate different steps of the voting process, including helping them return completed absentee ballot applications.

21. SB 202 will impair Advancing Justice–Atlanta's ability to engage in its projects by forcing the organization to divert resources and undertake significant efforts to counteract and stem the negative impact that SB 202 will have on Asian American voters and other LEP voters' ability to vote by mail. These efforts will include educating voters on new restrictions related to voting by mail, including the shortened time window for requesting an absentee ballot; the photo ID requirement for requesting an absentee ballot; prohibitions on who can handle a completed absentee ballot application; and further information that voters must provide on their absentee ballots. These types of additional efforts for proper voter education necessitated by SB 202 will require Advancing Justice–Atlanta to produce significant print and digital materials; translate these materials into multiple languages; and distribute them through various channels, including social media, traditional media, and text messaging platforms. Advancing Justice–Atlanta will also need to train staff and educate its community partners on SB 202's changes to the voting by mail process.

22. Advancing Justice–Atlanta will also help AAPI and other LEP voters navigate or resolve higher voting hurdles they are likely to face under SB 202. For example, Advancing Justice–Atlanta will identify and assist voters whose absentee ballot applications are rejected for failure to submit photo IDs or voters whose absentee ballots are rejected because of missing or

mismatching identifying information on their ballots. Advancing Justice–Atlanta will also create, translate, and distribute guides to AAPI communities explaining how voters can cure these errors.

23. All of these efforts will require Advancing Justice–Atlanta to divert significant financial and organizational resources in efforts to minimize the harmful effects that SB 202, particularly its changes to absentee voting, will have on Asian American communities. This diversion of resources will deplete from Advancing Justice–Atlanta's already limited resources otherwise devoted to existing GOTV and election protection efforts.

24. Defendant BRAD RAFFENSPERGER is Georgia's Secretary of State. He is sued in his official capacity. As Secretary of State, Defendant Raffensperger is Georgia's chief elections official, O.C.GA. § 21-2-210. He is responsible for administering and implementing Georgia's election laws and regulations as well as coordinating Georgia's compliance with the National Voter Registration Act of 193 (52 U.S.C. § 20507, *et seq.*). He routinely issues guidance to Georgia's county election officials on elections procedures and requirements.

25. Defendants REBECCA N. SULLIVAN, DAVID J. WORLEY, MATTHEW MASHBURN, and ANH LE are members of the State Election Board and are named herein in their official capacities. As members of the State Election Board, they are responsible for promulgating rules and regulations "conducive to the fair, legal, and orderly conduct of primaries and elections"; "to obtain uniformity in the practices and proceedings of [elections officials], as well as the legality and purity in all primaries and elections"; and "to define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote for each category of voting system used in this state." *See* O.C.G.A. § 21-2-31.

## IV. FACTUAL ALLEGATIONS

### A. Georgia AAPI Voters and the Recent Elections[1]

26.     Due in large part to the availability of absentee voting facilitated by efforts of organizations like Advancing Justice–Atlanta, AAPI voters in Georgia were able to turn out in record numbers during the recent elections—doubling AAPI voter turnout in comparison to 2016. Many who voted did so for the first time; in one district in Georgia, as many as two out of five AAPI voters were first-time voters.

27.     This is no small feat. Although AAPIs are among the fastest growing racial groups in Georgia, they generally have lower voter turn-out than other racial groups. This is in part due to the fact that limited English proficiency and linguistic isolation (that is, not having any household member over 14 who speaks English) is common among AAPI communities, and linguistic isolation has long been recognized as a barrier for civic participation, including voting. For context, more than one in five AAPI households in Georgia are LEP households. And while AAPIs make up less than five percent of Georgia's total population, they form approximately one third of the state's LEP population. Thus, obstacles against LEP voting disproportionately impact AAPI voters.

28.     In addition to linguistic challenges, AAPIs also endure socioeconomic ones, which the pandemic has only exacerbated. For example, over 17% of AAPIs in Georgia lack health insurance, and nearly 13% live in poverty (in comparison to the overall poverty rate of approximately nine percent).

---

[1] Plaintiff recognizes myriad diversities among and within Asian American, Asian and Asian immigrant, and Native Hawaiian and Pacific Islander communities, including distinct characteristics, histories, and experiences of these groups, and differences how they encounter discrimination in Georgia and beyond. Plaintiff uses the term "Asian American" or "AAPI" (Asian American Pacific Islander) generally in reference to the communities with whom it works currently in Georgia, and in the context of aggregated data that does not distinguish between Asian American and the Native Hawaiian and Pacific Islander communities.

29.     Moreover, since 2020, the Asian American community has experienced an alarming surge in anti-Asian American violence. Although hate crimes in general decreased by seven percent in 2020, the Asian American community saw a nearly 150% increase in incidents. From March 2020 to February 2021 alone, there were almost 3,800 reported attacks targeting the Asian American community, with the majority committed against women. In March 2021, a white gunman murdered six Asian American women at Asian-owned spas in the Atlanta area. Despite widespread condemnation of such violence following the Atlanta-area murders and other incidents, attacks against the Asian American community continue at crisis levels.

30.     Against this backdrop, the steep increase in AAPI voter participation in the General and Runoff Elections is a testament to the active, multi-year efforts of community groups— primarily Advancing Justice–Atlanta, which serves as a trusted and respected community resource for culturally and linguistically specific voter outreach and education. For example, Advancing Justice–Atlanta monitored and offered voter assistance at over 40 voting locations during the General and nearly 30 locations during the Runoff, training hundreds of volunteers to cover election protection shifts and provide interpretation in multiple languages, including during the early voting periods. Additionally, through its multi-lingual hotline, the organization informed hundreds of voters of their rights in their preferred languages and assisted them with early voting and absentee mail-in ballot applications and voting on request.

31.     AAPI voters also relied on effective local elections administrators who worked with community organizations like Advancing Justice–Atlanta to provide voting access to AAPIs in their jurisdictions, including LEP voters. In the General Election, DeKalb County made available for the first time, sample ballots in an Asian language, Korean. In the Runoff, Cobb County did the same.

32.     Voting studies show two notable trends with respect to how AAPIs cast their votes in Georgia. ***First***, AAPI voters rely disproportionately on absentee ballots to vote. Recent data show that AAPI voters vote by mail at rates higher than every other racial group. During the General Election, 54% of AAPI voters used mail-in voting, compared to 41% of Black voters, 33%

of Latine voters, and 31% of White voters. And during the Runoff Elections, 42% of AAPI voters voted by mail, compared to 35% of Black voters, 26% of Latine voters, and 26% of White voters. **Second**, AAPIs disproportionately applied for their absentee ballots in the 10 days prior to the General Election. The percentage of AAPI voters who applied for mail-in ballots during that time period was 38% higher than for all voters.



33.     At the same time, AAPI voters faced particular challenges to absentee voting. The absentee ballot applications that Secretary Raffenspeger mailed to Georgia voters ahead of the June 2020 primary were in English only. And despite the wide use of absentee ballots in the June 2020 primary, Secretary Raffensperger announced he would not mail absentee ballot applications to voters again for the General Election. As a result, elections officials in certain counties, including DeKalb and Fulton County, had to step in to mail absentee ballot applications to voters in their counties. Election officials in Gwinnett County voted to do the same, but the county commission opposed this measure. Advancing Justice-Atlanta also urged government officials to

mail absentee ballot applications in certain Asian languages in precincts with significant AAPI LEP populations, but to no avail. In the General Election, AAPI absentee ballot applications were rejected at a rate nearly three times higher than the average.

34.     There is widespread consensus that voting by mail is a safe and secure form of voting with infinitesimally small rates of malfeasance. But in the lead-up to and in the aftermath of the General and Runoff Elections, critics attacked the integrity of Georgia's elections, including by falsely casting doubt as to the integrity of mail-in ballots. The litany of lawsuits that ensued— nearly all of which challenged mail-in ballots—only served to further establish that the Georgia elections were secure and fairly administered.

35.     Indeed, Secretary Raffensperger, whose office conducted a thorough audit and investigation into claims of wrongdoing, explained to the U.S. Congress that "there is nowhere close to sufficient evidence to put in doubt the result of the presidential contest in Georgia," and that his office did not "see[] anything out of the ordinary scope of regular post-election issues." Governor Brian Kemp also refuted claims of fraud (calling them "simply a distraction"), and Lieutenant Governor Geoff Duncan similarly characterized such claims as "misinformation that continues to fly around."

**B. Racial Discrimination and Voting in Georgia**

36.     SB 202 is the latest iteration of Georgia's decades-long campaign to disenfranchise non-white voters through racially discriminatory voting laws. As the federal courts have repeatedly observed, "[t]he history of [Georgia's] segregation practice and laws at all levels has been rehashed so many times that the Court can all but take judicial notice thereof." *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994). *See also Johnson v. Miller*, 864 F. Supp. 1354, 1379–80 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995) ("[W]e have given formal judicial notice of the State's past discrimination in voting, and have acknowledged it in the recent cases."); *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs.*, 950 F. Supp. 2d 1294, 1314 (N.D. Ga. 2013), *aff'd in part, vacated in part, rev'd in part and remanded*, 775 F.3d 1336 (11th Cir. 2015) ("Generally, Georgia has a history chocked full of racial discrimination at

all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception.") (quoting *Brooks*, 848 F. Supp. at 1560).

37.     In recognition of the state's history of racial discrimination, Georgia became a covered jurisdiction under Section 5 of the VRA in 1965, which prohibited Georgia from making changes to its election practices or procedures until the federal government determined that the change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color." 52 U.S.C. § 10304. This provision requiring federal preclearance was prescient; during the preclearance requirement's tenure (1965-2013), Georgia's racially discriminatory practices required federal intervention 187 times. And of the states subject to the VRA's preclearance requirements, Georgia is the only state that enacted voting restrictions across five major categories studied by the U.S. Commission on Civil Rights: voter identification requirements, documentary proof of citizenship, voter purges, cuts to early voting, and polling place closures or relocations.

38.     After the U.S. Supreme Court's decision in *Shelby County v. Holder* in 2013, Georgia instated a wave of amendments to its elections laws and policies in an unveiled effort to suppress communities of color, including the AAPI community. 570 U.S. 529 (2013). Three examples are particularly relevant to understanding SB 202's impact on the AAPI community.

39.     ***First***, since 2008, Georgia has enacted various iterations of an "exact match" protocol: a voter registration protocol that places would-be voters in "pending" status if their voter registration data does not exactly match the same information as it appears in other state databases. In advance of the November 2018 general election, this protocol froze approximately 53,000 voter registrations, 80% of which belonged to people of color. Thousands of the impacted applicants were flagged as potential noncitizens when their applications were matched against undeniably outdated Department of Driver Services records. AAPI applicants are more than twice as likely as their white counterparts to be flagged under this protocol. The U.S. Department of Justice criticized Georgia's protocol as "flawed" and "frequently subject[ed] a disproportionate number of African-

American, Asian, and/or Hispanic voters to additional and . . . erroneous burdens on the right to register to vote." The "exact match" protocol has been the subject of extensive litigation, and although in 2019 the Georgia General Assembly largely ended the protocol with regard to identity data, eligible Georgia voters continue to be burdened by the "citizenship match" portion of the protocol. Many of these affected voters are AAPI, as they are often voters who recently naturalized as citizens and/or obtained a Georgia driver's license prior to naturalization.

40. **Second**, Georgia aggressively purges voter registration rolls in a way that disproportionately harms AAPI voters. In 2019 alone, the state removed 313,000 voters from the rolls on the grounds that they moved from their voter registration address. A subsequent analysis revealed that 63.3% of the voters had not moved at all and that the flawed purge process predominantly impacted non-white voters in the Atlanta metro region, where the majority of AAPI voters in Georgia reside.

41. **Third**, prior to 2018, Georgia law restricted who could assist LEP voters as an interpreter in state and local elections. This policy imposed a disproportionate burden on AAPI communities, given the high rates of limited English proficiency in the population. Only in response to litigation has Georgia now permitted LEP voters access to assistance in all Georgia elections.

42. Georgia also has repeatedly attempted to pass laws that adversely impact the AAPI community's ability to vote. For example, for many years, the legislature has tried to pass bills that would have required driver's licenses for noncitizens to be stigmatized with terms like "INELIGIBLE VOTER," "NOT VOTER ID," "NO LAWFUL STATUS," and "NOT ACCEPTABLE FOR OFFICIAL PURPOSES," which would require newly naturalized citizens to obtain new identification just to vote.

43. The legislature has also routinely attempted to make English the state's official language or otherwise prohibit government agencies from offering services in any other language. Between 2014 and 2018, the Georgia Senate introduced four different "English only" resolutions. All would have prohibited the dissemination of ballots and other election-related documents in any

language other than English, which would not only discriminate against LEP voters but also violate federal law.

44. SB 202 joins this long line of targeted attempts to disenfranchise voters of color. Following the 2020 election cycle, proponents of voting restrictions such as SB 202 have relied on racially-charged rhetoric to push for further voting restrictions that would disenfranchise AAPI communities. Representative Barry Fleming, the Chairman of the House Special Committee on Election Integrity and regular sponsor of other voting omnibus bills, referred to absentee ballots as being from the "shady" part of town when you could get "shanghaied," explicitly invoking classic anti-AAPI stereotypes to argue in favor of restricting ballot access.

45. More broadly, recent Georgia political campaigns have also been rife with racial overtones. In 2020, Georgia Senator David Perdue belittled Vice President Kamala Harris's first name—a name of AAPI origin—saying "Ka-ma-la, Ka-ma-la, Kamala-mala-mala, I don't know, whatever[.]" And in 2014, AAPI candidate Tim Hur and African American candidate Renita Hamilton were the subject of robocalls asking voters if they wanted to vote for "an Asian businessman or Africa-American [sic] swim mom."

46. In fact, Georgia's political candidates have been attacked for having names that merely sounded AAPI. For example, Georgia Senator Jon Ossoff was attacked during his campaign for having a foreign-sounding name: "If someone is going down the list, they're gonna vote for somebody who is familiar… If you just say 'Ossoff,' some folks are gonna think, 'Is he Muslim?  Is he Lebanese? Is he Indian?' It's an ethnic-sounding name, even though he may be a white guy, from Scotland or wherever."

## C. The Challenged Laws

### 1. SB 202's Legislative History

47. After Georgians elected Democrats Jon Ossoff and Raphael Warnock—respectively the first Jewish American and Black persons to ever represent the state in the Senate—the Georgia General Assembly embarked on a relentless campaign to amend the state's voting

laws. During the 2021-2022 legislative session, state legislators introduced over 50 different bills that would impact access to voting.

48.     Through a rushed and close-doored legislative process that involved virtually no input from AAPI state legislators, the Georgia General Assembly passed SB 202 just seventy-nine days after the Runoff Elections, restricting voting access to, *inter alia*, Georgia's AAPI community.

49.     The first version of SB 202, introduced on February 18, 2021, was a two-page bill that aimed to restrict the mailing of absentee ballot applications to voters who had not previously requested, received, or submitted an absentee ballot.

50.     From the start, state legislators made no attempt to veil their true intent behind SB 202. Notably, Georgia House Speaker David Ralston stated that he did not want every registered voter to receive an absentee ballot because that would "certainly drive up turnout." Given that voters of color—especially AAPI voters—used absentee ballots at high rates in the General and Runoff elections, Speaker Ralston's comments evinced the legislator's resistance against *non-white voters* receiving absentee ballots.

51.     Unsurprisingly, the legislative process itself was also racially tinged. General Assembly members consistently thwarted groups representing communities of color from participating in the legislative process. For example, the NAACP Legal Defense & Educational Fund was not permitted to testify at two House Committee hearings held on February 22 and 23, 2021, despite formally requesting an opportunity to testify on multiple occasions beforehand.

52.     The General Assembly was on notice that SB 202 would disparately impact communities of color. For example, the Southern Poverty Law Center Action Fund warned legislators that the bill was a calculated attempt to adversely impact minoritized groups, citing provisions such as the photo ID requirement for absentee ballots as disproportionately affecting people of color. In addition to public outcry over SB 202, government committees such as the Secretary of State's Bipartisan Task Force for Safe, Secure, and Accessible Elections stated their

"concern[s] that the legislative process is proceeding at a pace that does not allow for full examination of all factors that must be considered."

53.     On March 22, 2021, Advancing Justice–Atlanta submitted written testimony opposing the restrictions on absentee voting outlined in SB 202, highlighting the harm they would cause to AAPI voters in Georgia. The testimony included data on the high rates of voting by mail within the AAPI community; the already high rates of rejection of absentee ballot applications of AAPI voters; and descriptions of the specific harms that would befall LEP voters and new or first-time voters.

54.     The General Assembly jammed SB 202 through the legislative process, without notice to advocates, voters, or, at times, even other legislators. Few non-white legislators—and no AAPI legislators—were involved in the drafting process or able to offer amendments. Ignoring testimony by Advancing Justice–Atlanta and other civil rights and community interest groups, the General Assembly rushed SB 202 through the House and Senate. The House of Representatives passed SB 202 on March 25, 2021 and immediately transmitted the bill to the Senate without convening a conference committee. The Senate brought the bill to a vote just hours later, over objections by State Senators. What began as a two-page bill had, by then, ballooned into a 98-page bill with countless provisions aimed to curtail voting access for voters of color, including AAPIs.

55.     On March 25, 2021, Governor Brian Kemp signed SB 202 into law in, quite literally, a closed-door ceremony. State Representative Park Cannon, a Black woman, was arrested and forcibly removed from the State Capitol by state troopers after knocking on Governor Kemp's office door to try to witness the bill signing.

### 2. Impact of SB 202 Provisions on the AAPI Community

#### a.     Restricted Timeframes to Request and Receive Absentee Ballots

56.     Georgians have relied on vote-by-mail procedures for decades. Mail-in voting affords voters more time to study the issues and candidates on the ballot, allows vote-casting even when a voter has an inflexible work schedule or other obligations on Election Day, and obviates

the need for special transit arrangements to a polling place. Absentee voting has been and continues to be a crucial means to advance equitable participation Georgia's political processes.

57. Prior to SB 202's enactment, a voter could request an absentee ballot by providing certain basic information, such as the current address at which they are registered to vote and the voter's signature or the signature of the eligible relative requesting the ballot on behalf of the voter, and, if applicable, the signature of the person providing assistance to the voter. Additionally, before SB 202, voters could request an absentee ballot 180 days prior to an election through the Friday before the election.

58. In addition, the board of registrars was previously required to mail absentee ballots to eligible applicants between 45 to 49 days prior to presidential and general primary elections, other than municipal elections, and special elections in which a candidate for federal office appears on the ballot.

59. SB 202 restricts access to absentee voting in two key ways. First, Section 25 of SB 202 delays and compresses the time period during which a voter may request an absentee ballot. Unless a voter is hospitalized, SB 202 reduces the time a voter can request an absentee ballot from 180 days to 78 days prior to an election and requires that the application be received by the county election administrator 11 days prior to the election. Second, Section 27 of SB 202 delays the issuance of absentee ballots by 20 days; now, the board of registrars need only mail absentee ballots to eligible applicants 25 to 29 days prior to a qualifying election.

60. By shortening the window in which a voter may request an absentee ballot, and delaying the issuance of absentee ballots to eligible applicants, SB 202 restricts access to absentee voting. Such a restriction discriminates against and disproportionately impedes the franchise of AAPIs, who vote by mail more than any other racial group in Georgia.

61. AAPI voters, who are more likely to be LEP or first-time voters, often require more time and language assistance to review ballot materials and cast their ballots. In the event that the board of registrars or absentee ballot clerk identifies a mismatch regarding records of a voter's identifying information, that voter will, under SB 202, have less time to cure the discrepancy. A

reduced timeline to apply for and receive an absentee ballot severely burdens or outright denies AAPI voters the right to vote.

62. Moreover, AAPI absentee voters disproportionately request absentee ballots in the period closer to Election Day, so a reduction in the application window has a disproportionate impact on their ability to participate in the election. For the 2020 General Election, 31,939 people applied for absentee ballots in the ten days leading up to Election Day. While 1.83% of all mail-in voters applied for their ballots during this period, 2.53% of AAPIs applied for ballots during this period (2.25% for Black voters, three percent for Latine voters). People of color, and AAPIs specifically, will be disproportionately affected by SB 202's limitations on the opportunity to apply for and receive absentee ballots. All Georgia voters will be affected, but the law has an inequitable, discriminatory impact on AAPI voters.

63. In light of the current climate of anti-AAPI violence and the historical record of threats against people of color in Georgia, AAPIs are disproportionately harmed by the restriction of this voting option. Many AAPIs have been fearful or reluctant to go to the polls or other public places because of the anti-Asian sentiment that has been heightened and pervasive since the outbreak of the COVID-19 pandemic. The option to apply for and receive an absentee ballot by mail has therefore been an essential means by which AAPIs can vote safely and securely without risking their lives or enduring harassment or physical violence.

64. Proponents of SB 202 have failed to identify or offer any concrete facts to support a valid justification for reducing the timing and duration for requesting an absentee ballot, nor reducing the time that an eligible voter has to review her absentee ballot materials before the election. According to multiple statements by Governor Kemp, Lieutenant Governor Duncan, Secretary Raffensperger, and Georgia Voting Systems Manager Gabriel Sterling, there was no evidence of widespread vote-by-mail fraud in Georgia, nor has there ever been.

**b. Restrictions in Access to Secure Ballot Drop Boxes**

65.     Before SB 202, Georgia voters enjoyed the ability to safely and securely cast their ballots in one of 330 drop boxes in Georgia, many of which were freestanding outside of a building and often accessible 24 hours a day.

66.     Before SB 202, drop box locations were permitted to open as early as 49 days before Election Day, and these locations closed at 7:00 p.m. on Election Day.

67.     In the 2020 election cycle, counties were required to monitor each drop boxes through 24/7 video surveillance to ensure security of drop box voting, and they were mandated to retain the video footage for 30 days following certification of an election.

68.     The statewide use of drop boxes in the 2020 election cycle ensured voters had meaningful and continuous access to secure drop boxes, such that voters did not have to assume the risk of mail delays but could still avoid the crowds and long lines associated with in-person voting. Drop boxes were and continue to be necessary to providing equitable voting options.

69.     SB 202 restricts access to these drop boxes by limiting their numbers, mandating that they be placed indoors, and restricting their dates and hours of operation.

70.     *First*, Section 26 of SB 202 diminishes the availability of drop boxes to one per county, plus the lesser of one per every 100,000 "active registered voters" in the county or one per advance voting location in the county. This numerical limit reduces drop boxes availability in counties across Georgia, affecting both densely and sparsely populated counties.

71.     *Second*, SB 202 requires drop boxes to be established in the office of the board of registrars or absentee ballot clerk or inside an advance voting location. Only during Governor-declared emergencies may drop boxes be located outside.

72.     *Third*, SB 202 limits the date range and hours in which a drop box is available to the hours of operation of a registrar's office or advance voting location, mandating that the drop boxes must otherwise be closed. Also under the newly signed law, advance voting is only required between the hours of 9:00 a.m. through 5:00 p.m. on weekdays and certain weekend days,

commencing on the fourth Monday prior to an election and ending the Friday before Election Day. County registrars may extend the hours, but only to, at maximum, 7:00 a.m. to 7:00 p.m.

73.     These restrictions disproportionately impose a discriminatory and unnecessary burden on voters of color, including AAPI voters, who were more likely to cast their vote in drop boxes during the 2020 election cycle. For example, in Gwinnett County, whose population is approximately 50% non-white and 12.5% AAPI, there were twenty-three ballot drop boxes during the 2020 election cycle. Under SB 202, that number will dwindle; there will be six drop boxes, for a county of over 936,000 residents.



Source: Asian Americans Advancing Justice–Asian Law Caucus

74.     Proponents of SB 202 have failed to identify or offer any concrete facts to support a valid justification for reducing access to ballot drop boxes. There is no evidence that drop boxes were unsafe, ineffective, or prone to voter fraud.

### c.    Prohibition Against Proactive Mailing of Ballot Applications

75.    In advance of the June 2020 primary election, in the midst of a global pandemic, Secretary Raffensperger authorized the mailing of absentee ballot applications to all registered voters in Georgia.

76.    In recent elections, when the state declined to, election officials in Fulton County and DeKalb County opted to mail absentee ballot applications to all eligible voters within county lines. The proactive mailing of absentee ballot applications increased voting access, particularly for AAPI voters, who are more likely to be LEP voters or first-time voters unfamiliar with processes to request ballots.

77.    Now, Section 25 of SB 202 prohibits all election officials from sending absentee ballot applications except upon the request of a voter or authorized relative. Prohibiting election officials from proactively mailing absentee ballot applications significantly and disproportionately harms AAPI voters and other LEP communities. To request an absentee ballot, voters must now access and navigate the website of the Secretary of State or their election superintendent and registrar. Since the Secretary of State's website and most county board of elections' websites are available exclusively in English, the application request process is severely burdensome for AAPI LEP voters.

78.    This provision of SB 202 also harms Advancing Justice–Atlanta and other community organizations who engage in GOTV efforts with AAPI communities. If election officials proactively mailed absentee ballot applications to all eligible Georgia voters, Advancing Justice–Atlanta would not need to devote significant resources to educating voters on how to request absentee ballots and assisting voters in that process.

79.    Moreover, SB 202 imposes significant burdens on nongovernmental organizations—such as Advancing Justice–Atlanta—who often send absentee ballot applications to LEP voters or voters who need assistance with navigating the voting process. With the passage of SB 202, Advancing Justice–Atlanta must now ensure that absentee ballot applications they

distribute are accompanied by a disclaimer form that is subject to text, formatting, and color contrast requirements.

80.     Advancing Justice–Atlanta must also obtain and assess election data to ensure that it does not mail absentee ballot applications to any voters who have already "requested, received, or voted" an absentee ballot. Even if a voter has not timely received an absentee ballot application, Advancing Justice–Atlanta will not be able to send them an application if they have already requested one.

81.     Proponents of SB 202 have failed to identify or offer any concrete facts to support a valid justification for outright banning state and local election officials from proactively mailing ballot applications to eligible voters. There is no evidence of fraud associated with increased access to applications. Indeed, as has been the case since long before SB 202, ballot applications are subject to a thorough process in order to verify the voting eligibility of the applicant.

### d. Burdensome Identification Requirement

82.     SB 202 also imposes burdensome voter identification requirements. Specifically, Section 25 of SB 202 newly requires that the voter provide their Georgia's driver's license or Georgia state identification card number—in addition to the voter's registration address and date of birth. SB 202 further demands that a voter who does not have a Georgia driver's license or state ID card instead provide a photocopy or electronic image of a utility bill, bank statement, government check, paycheck, or other government document containing the name and address of the voter.

83.     AAPIs are less likely to have a driver's license than white Americans, forcing eligible AAPI voters to collect additional information and to present it by photocopy or electronic image, even after they have already provided unique identifying information. These additional steps impose additional cost, hardship, and introduce greater probability that an eligible voter will have their ballot disqualified due to inadvertent mistakes or confusion regarding these additional procedural requirements.

84. By requiring those who lack a driver's license to clear additional procedural hurdles before voting, this provision inflicts a substantial burden on voters. That burden falls disproportionately on LEP voters, who are more likely to be required to provide the additional documentation and who are more likely to require assistance in order to understand how to meet the additional identification requirements.

85. Proponents of SB 202 have failed to identify or offer any concrete facts to support a valid justification for imposing this onerous identification requirement. There is no evidence that the prior requirements of registration address, date of birth, and signature comparison were insufficient to guard against voting fraud.

**e.     Criminalization of "Handling" or Return of Completed Ballot Applications**

86. In previous election cycles, as a part of their voter registration and GOTV efforts, Advancing Justice–Atlanta volunteers and staff provided blank absentee applications to voters, assisted voters with completing the applications, as needed, and, to reduce the burden on voters, returned the completed absentee ballot applications to the Secretary of State. SB 202 now criminalizes aspects of Advancing Justice–Atlanta's voter assistance to community members.

87. Specifically, SB 202 criminalizes any person or entity's "handling" or returning of a voter's completed ballot application, subject to limited exceptions. This provision would criminalize the efforts of an Advancing Justice–Atlanta staff member who assists an eligible voter with returning their application, despite obtaining the consent of the voter, unless that staff member is a relative of the voter or the voter is LEP or physically disabled and receiving assistance.

88. SB 202's criminalization of application "handling" places an undue burden on eligible voters, limiting the available means by which they can submit their completed applications and obtain an absentee ballot. Restricting options for obtaining ballots is especially harmful to first-time voters who are unfamiliar with or may be intimidated by voting protocols, AAPI voters who are elderly, physically disabled, or otherwise have limited mobility, and voters with limited access to transportation or mail services, including rural voters. The harm is only compounded by the other provisions of SB 202 that further shorten and complicate the absentee voting process.

89.     This provision of SB 202 also imposes burdens on Advancing Justice–Atlanta and other community organizations which engage in GOTV efforts with AAPI communities. Under SB 202, Advancing Justice–Atlanta will need to devote more resources to educating voters on the narrow circumstances under which anyone other than the voter is authorized to return or handle their completed absentee ballot applications.

90.     Proponents of SB 202 have failed to identify or offer any concrete facts to support a valid justification for constraining the means by which a ballot application may be submitted. There is no evidence of fraud associated with assistance in returning absentee ballot applications, including by nonpartisan organizations like Advancing Justice–Atlanta.

## CLAIMS FOR RELIEF

### COUNT ONE
**Violation of Section 2 of the Voting Rights Act**
**52 U.S.C. § 10301, *et seq.***
**(Intentional Racial Discrimination & Discriminatory Results)**

91.     Plaintiff re-alleges and incorporates by reference all prior paragraphs as through fully set forth herein.

92.     Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301(a), prohibits voting laws, policies, or practices that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]"

93.     Section 2 requires a "totality of the circumstances" analysis that includes factors such as:

> the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or

> subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Thornburg v. Gingles*, 478 U.S. 30, 44–45 (1986). In violation of the rights of Plaintiff to not be burdened with the expenditure and diversion of limited organizational resources to address discriminatory restrictions on the right to vote, SB 202 (1) restricts the timeframe to request and receive absentee ballots; (2) restricts access to secure drop boxes; (3) prohibits election officials' proactive mailing of ballot applications; (4) imposes burdensome and unnecessary additional identification requirements for absentee ballots; and (5) criminalizes the "handling" of completed ballot applications.

94. SB 202 violates Section 2 of the VRA because the challenged provisions were adopted for the purpose of denying voters of color full and equal access to the political process.

95. SB 202 further violates Section 2 of the VRA because, given the totality of the circumstances alleged herein, the challenged provisions, individually and cumulatively, will disproportionately deny voters of color an equal opportunity to participate in the political process and to elect representatives of their choice by denying their right to vote. Specifically, SB 202 interacts with historical, socioeconomic, and other electoral conditions in Georgia to prevent voters of color, and particularly AAPI voters, from having an equal opportunity to participate in the political process on account of their race or color.

**COUNT TWO**
**Fourteenth and Fifteenth Amendments**
**U.S. Const. amend., XIV; 42 U.S.C. §1983**
**(Intentional Race Discrimination)**

96. Plaintiff re-alleges and incorporates by reference all prior paragraphs as through fully set forth herein.

97. 42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

98. Section 1 of the Fourteenth Amendment to the United States Constitution provides:

No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

99.     Section 1 of the Fifteenth Amendment to the United States Constitution provides:

The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

100.    Discriminatory intent may be established by proof that the defendants used race as a motivating factor in their decisions. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

101.    SB 202 violates the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, because it was purposefully enacted and operates to deny, abridge, or suppress the right to vote of otherwise eligible voter on account of race or color.

102.    SB 202 violates the Fifteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, because Defendants intentionally enacted and operate the law to deny, abridge, or suppress the right to vote on account of race or color.

103.    The facts alleged herein reveals that SB 202 was enacted, at least in part, with a racially discriminatory intent to discriminate against AAPI voters and other voters of color in violation of the United States Constitution.

104.    Georgia's long history and ongoing record of racial discrimination in the context of voting, the known and reasonably foreseeable discriminatory impact of SB 202, the sequence of events and substantive departures from the normal legislative process which resulted in the enactment of SB 202, and the tenuousness of the stated justifications for SB 202 raise a strong inference of a discriminatory purpose in violation of the Fourteenth Amendment.

**COUNT THREE**
**First and Fourteenth Amendments**
**U.S. Const. amend. XIV; 42 U.S.C. §1983**
**(Undue Burden on the Right to Vote)**

105.    Plaintiff re-alleges and incorporates by reference all prior paragraphs as through fully set forth herein.

106.    State election administration practices may not place burdens upon a plaintiff's First and Fourteenth Amendment rights to vote unless relevant and legitimate state interests of sufficient weight necessarily justify the magnitude and character of the burdens imposed. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). The more a challenged law burdens the right to vote, the more strictly must it be scrutinized. *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019). Even slight burdens must be justified by relevant and legitimate state interests of sufficient weight. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.).

107.    The challenged provisions of SB 202 collectively and individually impose severe and, at a minimum, significant burdens on eligible Georgia voters' right to vote, including on Plaintiff and members of Plaintiff's organization. In particular, SB 202 impose additional barriers to voting absentee and by drop box. These barriers disproportionately affect AAPI voters, who heavily rely upon absentee voting.

108.    It is well established that absentee voter fraud in Georgia—the justification for these restrictive measures—is virtually non-existent. According to the Arizona State University Cronkite School of Journalism, there have been only eight instances of voter fraud in Georgia since 2000 that resulted in a plea, consent order, or conviction—a negligible rate of fraud in absentee voting totaling 0.00003%.

109.    Relatedly, SB 202's identification requirement for absentee voters denies them the ability to vote absentee unless they possess certain limited forms of identification or identification numbers; restrictions on outdoor drop boxes that limit the availability of safe and secure methods of returning absentee ballots; and restrictions preventing election officials and organizations from even distributing absentee ballot *applications* or assisting voters in returning them.

110.    None of the burdens imposed by the challenged provisions of SB 202 are necessary to achieve, let alone reasonably related to, any sufficiently weighty legitimate state interest. The burdens imposed by the challenged provisions of SB 202 accordingly lack any constitutionally adequate justification, and must be enjoined.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment:

1.    Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure Rule 57, declaring that the challenged provisions of SB 202 are illegal and unconstitutional as described above, in violation of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, and the First, Fourteenth, and Fifteenth Amendments to the United States Constitution;

2.    Grant Plaintiff permanent injunctive relief enjoining Defendants, their agents, employees, and those persons acting in concert with them from enforcing or giving any effect to the challenged provisions of SB 202, including enjoining Defendants from conducting any elections utilizing those provisions;

3.    Issue an order requiring Defendants to pay Plaintiff's costs, expenses, and reasonable attorneys' fees incurred in the prosecution of this action, as authorized by, inter alia, 42 U.S.C. § 1988 and other applicable laws; and

4.    Grant such other and further relief as may be just and equitable.

Respectfully submitted this 1st day of April, 2021.

*/s/ Phi Nguyen*

PHI NGUYEN (Georgia Bar No. 578019)
HILLARY LI (Georgia Bar No. 898375)
**ASIAN AMERICANS ADVANCING
JUSTICE–ATLANTA**
5680 Oakbrook Parkway, Suite 148
Norcross, Georgia 30093
404 585 8446 (Telephone)
404 890 5690 (Facsimile)
*pnguyen@advancingjustice-atlanta.org*
*hli@advancingjustice-atlanta.org*

EILEEN MA*
**ASIAN AMERICANS ADVANCING
JUSTICE–ASIAN LAW CAUCUS**
55 Columbus Avenue
San Francisco, CA 94111
415 896 1701 (Telephone)
415 896 1702 (Facsimile)
*eileenm@advancingjustice-alc.org*

NIYATI SHAH*
TERRY AO MINNIS *°
**ASIAN AMERICANS ADVANCING
JUSTICE–AAJC**
1620 L Street, NW, Suite 1050
Washington, DC 20036
202 815 1098 (Telephone)
202 296 2318 (Facsimile)
*nshah@advancingjustice-aajc.org*
*tminnis@advancingjustice-aajc.org*

LEO L. LAM*
R. ADAM LAURIDSEN*
CONNIE P. SUNG*
CANDICE MAI KHANH NGUYEN*
**KEKER, VAN NEST AND PETERS LLP**
633 Battery Street
San Francisco, CA 94111-1809
415 391 5400 (Telephone)
415 397 7188 (Facsimile)
*llam@keker.com*
*alauridsen@keker.com*
*csung@keker.com*
*cnguyen@keker.com*

*Attorneys for Plaintiff*
*\*Pro hac vice applications forthcoming*
*° Not admitted in D.C.*

1670260