**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.:<br>1:21-MI-55555-JPB |
| ASIAN AMERICANS ADVANCING<br>JUSTICE–ATLANTA, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>BRAD RAFFENSPERGR, in his<br>official capacity as the Georgia<br>Secretary of State, et al.,<br><br>  Defendants,<br><br>REPUBLICAN NATIONAL<br>COMMITTEE, et al.,<br><br>  Intervenor-Defendants. | Civil Action No.:<br>1:21-CV-01333-JPB |

## SECOND AMENDED COMPLAINT FOR
## INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs ASIAN AMERICANS ADVANCING JUSTICE–ATLANTA ("Advancing Justice–Atlanta"), STEVEN J. PAIK, NORA AQUINO, ANGELINA THUY UDDULLAH, and ANJALI ENJETI-SYDOW (collectively, "Plaintiffs") file this Second Amended Complaint for Declaratory and Injunctive Relief against Defendants BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State (the "Secretary"); MATTHEW MASHBURN, SARA TINDALL GHAZAL, EDWARD LINDSEY, and DR. JANICE W. JOHNSTON, each in their official capacity as a member of the Georgia State Election Board; CLAYTON COUNTY BOARD OF ELECTIONS AND REGISTRATION, DARLENE JOHNSON, ARVIS WALKER, CAROL WESLEY, DOROTHY F. HALL, and DANNY HOPE, Members of the Clayton County Board of Elections and Registration, in their official capacities; SHAUNA DOZIER, Clayton County Elections Director, in her official capacity; COBB COUNTY BOARD OF ELECTIONS AND REGISTRATION, STEVEN F. BRUNING, TORI SILAS, STACY EFRAT, DEBBIE FISHER, and JENNIFER MOSBACHER, Members of the Cobb County Board of Elections and Registration, in their official capacities; TATE FALL, Director of the Cobb County Board of Elections and Registration, in

2

his official capacity; DEKALB COUNTY BOARD OF REGISTRATIONS AND
ELECTIONS, ANTHONY LEWIS, VASU ABHIRAMAN, NANCY JESTER,
SUSAN MOTTER, and KARLI SWIFT, Members of the DeKalb County Board of
Registrations and Elections, in their official capacities; KEISHA SMITH, Director
of Voter Registration and Elections in DeKalb County, in her official capacity;
FORSYTH COUNTY BOARD OF VOTER REGISTRATIONS AND
ELECTIONS, BARBARA LUTH, JOEL NATT, CARLA RADZIKINAS, DAN
THALIMER, and ANITA TUCKER, Members of the Forsyth County Registration
and Elections Board, in their official capacities; MANDI B. SMITH, Director of the
Forsyth County Board of Elections and Registration, in her official capacity;
FULTON COUNTY REGISTRATION AND ELECTIONS BOARD, PATRICE
PERKINS-HOOKER, AARON V. JOHNSON, MICHAEL HEEKIN, and TERESA
K. CRAWFORD, Members of the Fulton County Registration and Elections Board,
in their official capacities; NADINE WILLIAMS, Director of the Fulton County
Registrations and Elections board, in her official capacity; GWINNETT COUNTY
BOARD OF REGISTRATIONS AND ELECTIONS, ALICE O'LENICK,
WANDY TAYLOR, DAVID HANCOCK, and ANTHONY RODRIGUEZ,
Members of the Gwinnett County Board of Registrations and Elections, in their

official capacities; ZACH MANIFOLD, Gwinnett County Elections Supervisor, in his official capacity, and allege as follows:

## I.    INTRODUCTION

1.    Georgia voters' performance in the 2020 election cycle was a triumph for American democracy. In the face of numerous obstacles, including a global pandemic, Georgia held a safe and secure election, in which millions of Georgians were able to make their voices heard. Asian American and Pacific Islander ("AAPI") voters personified Georgia's successes. AAPI voter turnout in Georgia nearly *doubled* between the 2016 and 2020 elections. The widespread availability of absentee-by-mail ballots, also known as mail-in ballots, played a key role in this record turnout. During the 2020 election cycle, AAPIs voted by absentee-by-mail ballot at a higher rate than any other racial group in Georgia. Local election officials and civic groups, such as Plaintiff Advancing Justice–Atlanta, played a key role in helping AAPI voters exercise their rights to participate in the democratic process.

2.    Rather than celebrate and build upon these successes, the Georgia legislature has emphatically rejected them. Senate Bill 202 ("SB 202"), adopted in the immediate aftermath of record turnout from AAPI and other voters of color, systematically undermines or outright prohibits the election procedures that helped facilitate AAPI participation in the 2020 Presidential election ("General Election")

and subsequent 2021 U.S. Senate runoff elections ("Runoff Elections"). SB 202 perpetrates explicit and per se voter suppression. In particular, SB 202 erects new obstacles to voting that burden the rights of AAPI voters and other voters of color.

3.     Unfortunately, these tactics are familiar. Georgia's long history of racially discriminatory election procedures is well-established, and the rhetoric and circumstances around SB 202's passage place the bill squarely in the lineage of prior attempts to suppress non-white voters. But from poll taxes to "white primaries" to literacy tests, courts have rejected past efforts to deny Georgia voters of color equal access to the democratic process. SB 202 should meet the same fate on the scrap heap of history.

4.     SB 202's discriminatory overhaul of Georgia's election procedures is particularly harmful to AAPI voters with respect to the numerous ways in which it restricts absentee-by-mail voting. SB 202 dramatically reduces the time during which voters may request and return absentee-by-mail ballots, eliminates drop-off locations, bars local and state officials from proactively mailing absentee ballot applications, and imposes new, burdensome voter identification requirements.

5.     No community will feel SB 202's baseless restrictions on absentee voting more forcefully than AAPI voters. During the General Election, AAPI voters relied on absentee-by-mail voting at a rate higher than all groups of voters.

Approximately 40% of AAPI voters cast absentee-by-mail ballots, compared to the overall absentee-by-mail voting rate of around 26%. Similarly, during the Runoff Elections, approximately 34% of AAPI voters cast absentee ballots by mail, compared to the overall absentee voting rate of around 24%. Further demonstrating a preference for mail-in voting, roughly one-third of Georgia's AAPI registered voters requested absentee ballots in the General Election—a higher rate of application than the average across all racial groups.

6.     As these statistics reflect, absentee-by-mail ballots facilitate greater AAPI participation in Georgia's elections. The Asian American community has a higher proportion of foreign-born residents compared to other racial groups in Georgia, and limited English proficiency ("LEP") remains common in the Georgia Asian American community. Newly naturalized citizens, first time voters, and LEP voters often need more time to review their ballot materials and/or seek assistance from persons authorized under Georgia law. Absentee-by-mail voting allows these voters crucial time and resources that may be less available or accessible through in-person voting.

7.     The hurdles that absentee-by-mail voting aim to overcome have only been exacerbated for the AAPI community by the COVID-19 pandemic. The global pandemic has contributed to a surge in anti-AAPI violence, due in part to use of

racist slurs like "China virus" or "kung flu" to refer to coronavirus. Incidents of violence or harassment against the AAPI community are not a new phenomenon but jumped by almost 150% in 2020. Nearly 3,800 anti-AAPI hate incidents were reported from March 19, 2020 to February 28, 2021, the majority of which were reported by AAPI women. This alarming escalation in threats and harassment has created a climate in which many Asian Americans fear for their safety in unfamiliar public places, further complicating the participation of Asian American voters in 2020 and 2021.

8.    These fears were heartbreakingly realized on March 16, 2021, when a white gunman murdered six women of Asian descent at Asian-owned spas in the Atlanta area. In the wake of that mass shooting, and in light of frequent and continuing reports across the country of AAPI-targeted assaults and killings, many Asian American voters in Georgia feel much less safe in public spaces. Given this ongoing spate of anti-Asian violence, the accessibility of absentee-by-mail voting has taken on particular importance for the AAPI community.

9.    Especially considering the continuing and compelling need for maintaining the absentee voting procedures Georgia employed in the 2020 election cycle, SB 202's sponsors have provided no justification for undermining those procedures. Despite having the most scrutinized state election count in a generation,

Georgia election officials found no significant irregularities or fraud in any method of voting, including the extensive use of absentee-by-mail voting. Claims disputing the validity of absentee ballots have been repeatedly rejected by Georgia officials and the courts. The most recent elections were, in the words of Secretary Raffensperger, "secure, reliable, and efficient."

10. In contrast to the well-documented integrity of Georgia's most recent elections, SB 202's sponsors have put forth no credible evidence to justify their sweeping overhaul of Georgia's election procedures. Through a rushed and closed-door legislative process, the General Assembly ignored numerous public outcries warning that the bill would disproportionately impact Georgia's voters of color. While the state legislature chose to disregard the discriminatory effects of SB 202, the courts should not.

11. SB 202's challenged provisions deny AAPI voters a full and equal opportunity to participate in the political process. By both purposeful intent and resulting impact, the challenged provisions violate Section 2 of the Voting Rights Act ("VRA") of 1965, as well as the rights of voters of color under the Fourteenth and Fifteenth Amendments to the United States Constitution.

12. After the record-setting turnout in the 2020 election cycle by voters of color, including AAPI voters, SB 202 is an obvious attempt to roll back the clock to

the racially-restrictive voting practices of Georgia's discredited past. That attempt should be categorically rejected. Accordingly, this Court should declare the challenged sections of SB 202 unlawful and unconstitutional and permanently enjoin their enforcement.

## II.    JURISDICTION AND VENUE

13.    Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

14.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343, because the matters in controversy arise under the Constitution and laws of the United States.

15.    This Court has personal jurisdiction over the Defendants, who are sued in their official capacities only.

16.    Venue is proper in the U.S. District Court for the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b)(2) and under Local Civ. R. 3.1 because, *inter alia*, several defendants reside in this district and this division, and a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district. Plaintiffs also operate and/or reside within this district and division.

17.    This Court has the authority to enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

### III.    PARTIES

18.    By carrying out the challenged provisions of SB 202, Defendants cause organizational and individual harm to Plaintiffs.

19.    Plaintiff Advancing Justice–Atlanta is a nonpartisan, nonprofit organization founded in 2010 and located in Norcross, Georgia. Advancing Justice–Atlanta is dedicated to protecting the civil rights of AAPIs and other immigrant communities in Georgia through policy advocacy, civic engagement and organizing, legal services, and litigation. As part of its civic engagement and organizing work, Advancing Justice–Atlanta engages in voter registration, get out the vote ("GOTV"), and election protection activities in local, state, and federal elections, with a primary focus on AAPI communities.[1] Advancing Justice–Atlanta conducts its GOTV work and other voter protection work across the state, including in the counties in which

---

[1] Plaintiffs recognize myriad diversities among and within Asian American, Asian and Asian immigrant, and Native Hawaiian and Pacific Islander communities, including distinct characteristics, histories, and experiences of these groups, and differences in how they encounter discrimination in Georgia and beyond. Plaintiff uses the term "Asian American" or "AAPI" (Asian American Pacific Islander) generally in reference to the communities with whom it works currently in Georgia, and in the context of aggregated data that does not distinguish between Asian American and the Native Hawaiian and Pacific Islander communities.

Defendants operate. Advancing Justice–Atlanta conducts all of its election-related activities in English and multiple non-English languages. Its GOTV efforts for the June 2020 primary, General Election, and Runoff Elections included outreach to thousands of Georgia voters in Korean, Chinese, Vietnamese, Hindi, and Spanish encouraging them to vote early in person or by mail. Advancing Justice–Atlanta also assists voters with navigating different steps of the voting process, including helping them return completed absentee ballot applications.

20.    SB 202 will impair Advancing Justice–Atlanta's ability to engage in its projects by forcing the organization to divert resources and undertake significant efforts to counteract and stem the negative impact that SB 202 will have on AAPI voters and other LEP voters' ability to vote absentee-by-mail.[2] These efforts will include educating voters on new restrictions related to voting by mail, such as the shortened time window for requesting an absentee ballot; the new photo ID requirement for requesting an absentee ballot; limitations upon absentee ballot drop-off locations; and further information that voters must provide on their absentee

---

[2] Throughout this Second Amended Complaint, references to "absentee-by-mail voting," "absentee voting," "mail-in voting," and all similar variations refer to mailing an absentee ballot using the postal service, hand delivering an absentee ballot to the county registrar, or dropping off an absentee ballot at an official drop box.  The terms do not refer to early in-person voting using the ballot marking device voting machines.

ballots. SB 202 will require Advancing Justice–Atlanta to expend additional voter-education efforts, such as producing significant print and digital materials; translating these materials into multiple languages; and distributing them through various channels, including social media, traditional media, ethnic media, and text messaging platforms. Advancing Justice–Atlanta will need to train staff and educate its community partners on SB 202's changes to the voting by mail process.

21.     Advancing Justice–Atlanta will also need to help AAPI and other LEP voters navigate or resolve higher voting hurdles they will face under SB 202. For example, Advancing Justice–Atlanta will need to identify and assist voters whose absentee ballot applications are rejected for failure to submit required ID documents or voters whose absentee ballots are rejected because of missing or mismatching identifying information on their ballots. Advancing Justice–Atlanta will also be required to create, translate, and distribute guides to AAPI communities explaining how voters can cure these errors.

22.     All of these efforts will require Advancing Justice–Atlanta to divert significant financial and organizational resources to minimize the harmful effects that SB 202, particularly its changes to absentee-by-mail voting, will have on AAPI communities. This diversion of resources will deplete the already limited resources

Advancing Justice–Atlanta otherwise devotes to existing GOTV and election protection efforts.

23.    Plaintiff Steven J. Paik is a 69-year-old Korean American and registered voter in Gwinnett County. Mr. Paik voted for the very first time in the 2020 General Election. In the past, Mr. Paik did not vote because his limited English proficiency made navigating the voting process challenging. In the General Election, however, he was able to apply for and cast a mail-in ballot with the help of Advancing Justice–Atlanta. Advancing Justice–Atlanta provided Mr. Paik with information in Korean on how to vote by mail, which he used to complete and submit his absentee ballot. In the Runoff Elections, Mr. Paik had to apply for an absentee ballot twice. When his ballot did not arrive after he requested it the first time, he contacted Advancing Justice–Atlanta for assistance; he eventually received his mail-in ballot approximately two weeks before Election Day. Mr. Paik opted to vote absentee-by-mail primarily to reduce language barriers, minimize health risks, and avoid long lines. Mr. Paik decided to use a drop box in Dacula to vote in both the General and Runoff Elections because of the convenience and reliability.

24.    Plaintiff Nora Aquino is a Filipina American and registered voter in DeKalb County. At 82 years old, she is a retired nurse who previously worked at the VA hospital for over 20 years. During the 2020 election cycle, Ms. Aquino wanted

to vote by mail because of her age and the fact that she is unable to drive. Although Ms. Aquino requested an absentee ballot with the help of her daughter for the General Election, she never received it. As a result, her daughter had to drive her, during the middle of her work day, to a polling location on the last day of early voting so Ms. Aquino could vote in person. For the Runoff Elections, Ms. Aquino successfully applied for an absentee mail-in ballot with assistance from her daughter. She voted by dropping her ballot at a drop box at Brookhaven City Hall after business hours.

25.     Plaintiff  Angelina Thuy Uddullahis a Vietnamese American and registered voter in Gwinnett County. In the General Election, Ms. Uddullah and her mother voted early in person in the evening after they both finished work. They waited in line for approximately 30 minutes and cast their ballots at approximately 7 p.m. For the Runoff Elections, Ms. Uddullah elected to vote absentee-by-mail to accommodate her long and unpredictable working hours and to minimize health risks during a global pandemic. She submitted her ballot at a drop box at Shorty Howell Park on a Saturday afternoon. Ms. Uddullah also assisted her LEP mother in applying for and completing an absentee ballot. Since the Runoff Elections, Ms. Uddullah's preference for absentee-by-mail voting increased due to greater fear of in-person voting amid a dangerous rise in anti-Asian violence.

26.    Plaintiff Anjali Enjeti-Sydow is an Indian American and registered voter in Fulton County. She regularly engages in efforts to increase Asian American voter turnout in Georgia. She worked as a Fulton County poll worker during the Primary Runoff, General Election, and Runoff Elections. Ms. Enjeti-Sydow, together with her husband and daughter, voted by absentee-by-mail ballot for all three elections, using a drop box outside of the Ocee Library in Johns Creek each time. During each election, Ms. Enjeti-Sydow's family dropped off their ballots on Sundays, when the library was closed. Ms. Enjeti-Sydow opted to use absentee-by-mail ballots because she believes they are the most secure way to vote, particularly given the convenience and reliability of drop boxes.

27.    As discussed further below, SB 202 will harm Plaintiffs Paik, Aquino, Uddullah, and Enjeti-Sydow in the future by further restricting their ability to apply for, receive, and cast mail-in ballots, including by using drop boxes.

28.    Defendant Brad Raffensperger is Georgia's Secretary of State. He is sued in his official capacity. As Secretary of State, Defendant Raffensperger is Georgia's chief elections official, O.C.GA. § 21-2-210. He is responsible for administering and implementing Georgia's election laws and regulations as well as coordinating Georgia's compliance with the National Voter Registration Act of 1993

(52 U.S.C. § 20507, *et seq.*). He routinely issues guidance to Georgia's county election officials on elections procedures and requirements.

29.     Defendants Matthew Mashburn, Sara Tindall Ghazal, Edward Lindsey, and Dr. Janice W. Johnston are members of the State Election Board and are named herein in their official capacities. As members of the State Election Board, they are responsible for promulgating rules and regulations "conducive to the fair, legal, and orderly conduct of primaries and elections"; "to obtain uniformity in the practices and proceedings of [elections officials], as well as the legality and purity in all primaries and elections"; and "to define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote for each category of voting system used in this state." *See* O.C.G.A. § 21-2-31.

30.     Defendant Clayton County Board of Elections and Registration is responsible for the conduct of primary and general elections in Clayton County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

31.     Defendants Darlene Johnson, Arvis Walker, Carol Wesley, Dorothy Foster Hall, and Danny Hope are the Members of the Clayton County Board of Elections and Registration, reside in Clayton County, and are sued in their official capacities.

32.     Defendant Shauna Dozier is the Clayton County Elections Director and is sued in her official capacity. Defendant Dozier is responsible for the day-to-day operations of running elections in Clayton County, to the extent such power does not conflict with the power of the Secretary of State.

33.     Defendant Cobb County Board of Elections and Registration is responsible for the conduct of primary and general elections in Cobb County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

34.     Defendants Steven F. Bruning, Tori Silas, Stacy Efrat, Debbie Fisher, and Jennifer Mosbacher are the Members of the Cobb County Board of Elections and Registration, reside in Cobb County, and are sued in their official capacities.

35.     Defendant Tate Fall is the Director of the Cobb County Board of Elections and Registration and is sued in his official capacity. Defendant Fall is responsible for the day-to-day operations of running elections in Cobb County, to the extent such power does not conflict with the power of the Secretary of State.

36.     Defendant DeKalb County Board of Registration and Elections is responsible for the conduct of primary and general elections in DeKalb County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

37.     Defendants Anthony Lewis, Vasu Abhiraman, Nancy Jester, Sustan Motter, and Karli Swift are the Members of the DeKalb County Board of Registration & Elections, reside in DeKalb County, and are sued in their official capacities.

38.     Defendant Keisha Smith is the Director of Voter Registration and Elections in DeKalb County and is sued in her official capacity. Defendant Smith is in charge of the day-to-day operations of running elections in DeKalb County, to the extent such power does not conflict with the power of the Secretary of State.

39.     Defendant Forsyth County Board of Voter Registrations and Elections is responsible for the conduct of primary and general elections in Forsyth County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

40.     Defendants Barbara Luth, Joel Natt, Carla Radzikinas, Dan Thalimer, and Anita Tucker are the Members of the Forsyth County Board of Voter Registrations and Elections, reside in Forsyth County, and are sued in their official capacities.

41.     Defendant Mandi B. Smith is the Director of the Forsyth County Board of Voter Registrations and Elections and is sued in her official capacity. Defendant Smith is responsible for the day-to-day operations of running elections in Forsyth

County, to the extent such power does not conflict with the power of the Secretary of State.

42.     Defendant Fulton County Registration and Elections Board is responsible for the conduct of primary and general elections in Fulton County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

43.     Defendants Patrice Perkins-Hooker, Aaron V. Johnson, Michael Heekin, and Teresa K. Crawford are the Members of the Fulton County Registration and Elections Board, reside in Fulton County, and are sued in their official capacities.

44.     Defendant Nadine Williams is the Director of the Fulton County Registration and Elections Board and is sued in her official capacity. Defendant Williams is responsible for the day-to-day operations of running elections in Fulton County, to the extent such power does not conflict with the power of the Secretary of State.

45.     Defendant Gwinnett County Board of Registrations and Elections is responsible for the conduct of primary and general elections in Gwinnett County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

46.     Defendants Alice O'Lenick, Wandy Taylor, David Hancock, and Anthony Rodriguez are the Members of the Gwinnett County Board of Registrations and Elections, reside in Gwinnett County, and are sued in their official capacities.

47.     Defendant Zach Manifold is the Gwinnett County Elections Supervisor and is sued in his official capacity. Defendant Manifold is responsible for the day-to-day operations of running elections in Gwinnett County, to the extent such power does not conflict with the power of the Secretary of State.

## IV.     FACTUAL ALLEGATIONS

### A.     Georgia AAPI Voters and the Recent Elections

48.     Due in large part to efforts of organizations like Advancing Justice–Atlanta to advance voter participation, including by ensuring access to absentee- by-mail voting, AAPI voters in Georgia were able to turn out in record numbers during the recent elections—nearly doubling AAPI voter turnout from 2016. Many who voted did so for the first time; in one district in Georgia, as many as two out of five AAPI voters were first-time voters.

49.     This is no small feat. Although AAPIs are among the fastest growing racial groups in Georgia, they generally have lower voter turnout than other racial groups. This is in part due to the fact that limited English proficiency and linguistic isolation (that is, not having any household member over 14 who speaks English)

are common among AAPI communities, and linguistic isolation has long been recognized as a barrier for civic participation, including voting. For context, more than one in five AAPI households in Georgia are LEP households. And while Asian Americans make up less than five percent of Georgia's total population, they form approximately one quarter (24.39%) of the state's LEP population. Thus, obstacles that affect LEP voters disproportionately impact AAPI voters.

50.    In addition to linguistic challenges, AAPIs endure socioeconomic ones, which the pandemic has only exacerbated. For example, according to one report, over 17% of Asian Americans in Georgia lack health insurance. And more than 25% of Georgia's Pacific Islanders live in poverty, in comparison to the overall poverty rate of about 15%.

51.    Moreover, since 2020, the Asian American community has experienced an alarming surge in anti-Asian American violence. Although overall 2020 reported hate crimes decreased by 7% from the previous year, anti-Asian hate crimes increased by nearly 150% in the same period. From March 2020 to February 2021 alone, there were almost 3,800 reported hate incidents targeting the Asian American community, with the majority committed against women. In March 2021, a white gunman murdered six women of Asian descent at Asian-owned spas in the Atlanta

area. Despite widespread public condemnation of such violence following the Atlanta-area murders and other incidents, anti-Asian attacks continue at crisis levels.

52.     Against this backdrop, the steep increase in AAPI voter participation in the General and Runoff Elections is a testament to the active, multi-year efforts of community groups—primarily Advancing Justice–Atlanta, which serves as a trusted and respected community resource for culturally and linguistically specific voter outreach and education. For example, Advancing Justice–Atlanta monitored and offered nonpartisan voter assistance at over 40 voting locations during the General Election and nearly 30 locations during the Runoff Elections, across multiple counties and including during the early voting periods. Advancing Justice–Atlanta trained hundreds of volunteers to both cover election protection shifts and provide interpretation in multiple languages. Additionally, through its multi-lingual hotline, the organization informed hundreds of Georgia voters of their rights in their preferred languages and, upon request, provided language assistance to those who voted by mail or in person.

53.     AAPI voters also relied on effective local elections administrators who worked with community organizations like Advancing Justice–Atlanta to increase voting access to AAPIs, particularly LEP voters, in their jurisdictions. In the General Election, DeKalb County made available sample ballots in an Asian language,

Korean, for the first time in Georgia's history. In the Runoff Elections, Cobb County did the same.

54.     Voting analyses show two notable trends with respect to how AAPIs cast their votes in Georgia. *First*, AAPI voters rely disproportionately on absentee ballots to vote. Recent data show that Georgia's AAPI voters vote absentee-by-mail at rates higher than every other racial group. During the General Election, nearly 40% of AAPI voters used mail-in voting, compared to about 26% of all voters on average. And during the Runoff Elections, over 34% of AAPI voters voted by mail, compared to less than 24% of all voters on average. *Second*, AAPIs disproportionately apply for absentee ballots in Georgia; AAPI absentee-by-mail ballot application rates exceeded the average in the Runoff Elections and the General Election, including during the ten days prior to the General Election Day. The percentage of AAPI voters who applied for mail-in ballots during that ten-day period was significantly higher than for all voters.

55.     At the same time, AAPI voters faced particular challenges to absentee-by-mail voting. The absentee ballot applications that Secretary Raffensperger mailed to Georgia voters ahead of the June 2020 primary were in English only. And despite the wide use of absentee-by-mail ballots in the June 2020 primary, Secretary Raffensperger decided not to mail absentee ballot applications to voters again for the

General Election. As a result, elections officials in certain counties, including DeKalb and Fulton County, stepped in to mail absentee ballot applications to voters in their counties. Election officials in Gwinnett County voted to do the same, but the county commission opposed the measure. Advancing Justice–Atlanta also urged county officials to mail absentee ballot applications in certain Asian languages in precincts with significant AAPI LEP populations, but to no avail. In the General Election, AAPI absentee ballot applications were rejected at a rate more than two times higher than the average.

56.     There is widespread consensus that voting by mail is a safe and secure form of voting. But in the lead-up to and in the aftermath of the General and Runoff Elections, critics attacked the integrity of Georgia's elections. The litany of legal challenges that ensued—nearly all of which attempted to cast doubt on the legitimacy of mail-in ballots—were repeatedly rejected, serving to further establish that the Georgia elections were secure and fairly administered.

57.     Indeed, Secretary Raffensperger, whose office conducted a thorough audit and investigation into claims of wrongdoing, explained to the U.S. Congress that "there is nowhere close to sufficient evidence to put in doubt the result of the presidential contest in Georgia" and that his office did not "see[] anything out of the ordinary scope of regular post-election issues." Governor Brian Kemp also refuted

claims of fraud (calling them "simply a distraction"), and Lieutenant Governor Geoff Duncan similarly characterized such claims as "misinformation that continues to fly around."

## B.   Racial Discrimination and Voting in Georgia

58.    SB 202 is the latest iteration of Georgia's decades-long campaign to disenfranchise non-white voters through racially discriminatory voting laws. As the federal courts have repeatedly observed, "[t]he history of [Georgia's] segregation practice and laws at all levels has been rehashed so many times that the Court can all but take judicial notice thereof." *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994). *See also Johnson v. Miller*, 864 F. Supp. 1354, 1379–80 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995) ("[W]e have given formal judicial notice of the State's past discrimination in voting, and have acknowledged it in the recent cases."); *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs.*, 950 F. Supp. 2d 1294, 1314 (N.D. Ga. 2013), *aff'd in part, vacated in part, rev'd in part and remanded*, 775 F.3d 1336 (11th Cir. 2015) ("Generally, Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and

conspicuous realities, the norm rather than the exception.") (quoting *Brooks*, <u>848 F.</u> <u>Supp. at 1560</u>).

59.    In recognition of the state's history of racial discrimination, Georgia became a covered jurisdiction under Section 5 of the VRA in 1965, which prohibited Georgia from making changes to its election practices or procedures until the federal government determined that the change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color." <u>52</u> <u>U.S.C. § 10304</u>. Of the states previously subject to the VRA's preclearance requirements, Georgia is the only state that enacted voting restrictions across five major categories studied by the U.S. Commission on Civil Rights: voter identification requirements, documentary proof of citizenship, voter purges, cuts to early voting, and polling place closures or relocations.

60.    In 2013, however, the U.S. Supreme Court's decision in *Shelby County v. Holder* invalidated the coverage provision that determined which jurisdictions were subject to the Section 5 of the VRA—effectively barring enforcement of the preclearance requirement.  <u>570 U.S. 529</u> (2013).  As a result, Georgia's lawmakers and other state officials immediately instated a wave of amendments to its elections laws and policies in an unveiled effort to suppress communities of color, including the AAPI community. Several post-*Shelby* examples are particularly relevant to

understanding how SB 202 builds on a sustained pattern of state governmental efforts to disenfranchise Georgia's AAPI community, among other communities of color.

61.    ***First***, in advance of the November 2018 general election, the Secretary of State, in administering the "exact match" protocol, froze approximately 53,000 voter registrations, 80% of which belonged to people of color.  The "exact match" protocol, which has existed in Georgia in some iteration since 2008, is a voter registration protocol that places would-be voters in "pending" status if their voter registration data does not exactly match the same information as it appears in other state databases. In 2009, the U.S. Department of Justice (DOJ) criticized Georgia's protocol as "flawed" and "frequently subject[ed] a disproportionate number of African-American, Asian, and/or Hispanic voters to additional and . . . erroneous burdens on the right to register to vote." The DOJ found that AAPI applicants were more than twice as likely as their white counterparts to be flagged under "exact match."

62.    The "exact match" protocol has been the subject of extensive litigation. And although in 2019 the Georgia General Assembly largely ended the protocol with regard to identity data, eligible Georgia voters continue to be burdened by the "citizenship match" portion of the protocol, which flags voters as potential

noncitizens based on data known to be outdated from the Department of Driver Services. Many of the affected voters are AAPI, as they are often voters who recently naturalized as citizens and/or obtained a Georgia driver's license prior to naturalization.

63.   **Second**, in the wake of the *Shelby County* decision, Georgia's Secretary of State has been emboldened to aggressively purge voter registration rolls in a way that disproportionately harms AAPI voters. In 2019 alone, the state removed 313,000 voters from the rolls on the grounds that they moved from their voter registration address. A subsequent analysis revealed that 63.3% of the voters had not moved at all and that the flawed purge process predominantly impacted non-white voters in the Metro Atlanta region, where the majority of AAPI voters in Georgia reside.

64.   **Third**, up until 2018, Georgia law illegally restricted who could assist LEP voters as an interpreter in state and local elections. This policy imposed a disproportionate burden on AAPI voters, given the high rates of limited English proficiency in AAPI communities. Only in response to recent litigation does Georgia now permit LEP voters access to assistance in all Georgia elections.

65.   **Fourth**, the Georgia legislature has also repeatedly attempted to pass laws that adversely impact the AAPI community's ability to vote. For example, in 2016, 2018, 2019, and 2021, the General Assembly tried to pass bills that would

have required driver's licenses for noncitizens to be stigmatized with terms like "INELIGIBLE VOTER," "NOT VOTER ID," "NO LAWFUL STATUS," and "NOT ACCEPTABLE FOR OFFICIAL PURPOSES," which would require newly naturalized citizens to obtain new identification just to vote.

66.   *Fifth*, the legislature has also routinely attempted to make English the state's official language or otherwise prohibit government agencies from offering services in any other language. Between 2014 and 2018, the Georgia Senate introduced four different "English only" resolutions. All would have prohibited the dissemination of ballots and other election-related documents in any language other than English, which would not only discriminate against LEP voters but also violate federal law.

67.   SB 202 joins this long line of discriminatory attempts to target and disenfranchise voters of color and LEP voters. Following the 2020 election cycle, proponents of voting restrictions such as SB 202 have relied on racially charged rhetoric to push for further voting restrictions that would disenfranchise AAPI communities. Explicitly invoking discriminatory stereotypes to argue in favor of restricting ballot access to AAPI voters, Representative Barry Fleming, the Chairman of the House Special Committee on Election Integrity and regular sponsor of other voting omnibus bills, referred to absentee ballots as being from the "shady"

part of town where you could get "shanghaied." Tellingly, Fleming's longstanding history as a legislator includes the aforementioned "exact match" system in 2017 that led to the freezing of 53,000 voter registrations; the reduction of early voting periods for municipal elections in 2014; and an attempt to codify the offense of "conspiracy to commit election fraud" in 2005, despite no evidence of widespread voter fraud.

68.     More broadly, recent Georgia political campaigns have also been rife with racial overtones. In 2020, Georgia Senator David Perdue belittled Vice President Kamala Harris's name—which is of Asian origin—saying "Ka-ma-la, Ka-ma-la, Kamala-mala-mala, I don't know, whatever[.]" And in 2014, Asian American candidate Tim Hur and Black candidate Renita Hamilton were the subject of robocalls asking voters if they wanted to vote for "an Asian businessman or Africa-American [sic] swim mom."

69.     In fact, Georgia's political candidates have been attacked for having names that merely sounded Asian. For example, Georgia Senator Jon Ossoff was even attacked during his campaign for having a foreign-sounding name: "If someone is going down the list, they're gonna vote for somebody who is familiar… If you just say 'Ossoff,' some folks are gonna think, 'Is he Muslim?  Is he Lebanese? Is he

Indian?' It's an ethnic-sounding name, even though he may be a white guy, from Scotland or wherever."

## V.   THE CHALLENGED LAWS

### A.   SB 202's Legislative History

70.    After Georgians elected Jon Ossoff and Raphael Warnock—the first Jewish American and Black U.S. Senators, respectively, to represent Georgia—the Georgia General Assembly embarked on a relentless campaign to amend the state's voting laws. It formed the House Special Committee on Election Integrity, a 14-member committee comprised overwhelmingly of white legislators with no AAPI or Latine members. And during the 2021–22 legislative session, state legislators introduced over 50 different bills that would restrict access to voting.

71.    Through a rushed and close-doored legislative process that involved virtually no input from AAPI state legislators, the Georgia General Assembly passed SB 202 on March 25, 2021, just 79 days after the Runoff Elections, restricting voting access for, *inter alia*, Georgia's AAPI community.

72.    The first version of SB 202, introduced on February 18, 2021, was a two-page bill that aimed to restrict the mailing of absentee ballot applications to voters who had not previously requested, received, or submitted an absentee ballot.

In other words, at its core, SB 202 was set on curbing and seriously limiting the ability of Georgia's voters to cast absentee ballots.

73.   In fact, from the start, state legislators made no attempt to veil their true intent behind SB 202. Notably, Georgia House Speaker David Ralston stated that he did not want every registered voter to receive an absentee ballot because that would "certainly drive up turnout." Given that voters of color—especially AAPI voters— used absentee-by-mail ballots at high rates in the General and Runoff Elections, Speaker Ralston's comments evinced the legislator's intent to deprive *non-white voters* of ballot access.

74.   Unsurprisingly, the legislative process itself was also racially tinged. General Assembly members consistently thwarted groups representing communities of color from participating in the legislative process. For example, the NAACP Legal Defense & Educational Fund was not permitted to testify at two House Committee hearings held on February 22 and 23, 2021, despite formally requesting an opportunity to testify on multiple occasions beforehand.

75.   The General Assembly was on notice that SB 202 would disparately impact communities of color. For example, the Southern Poverty Law Center Action Fund warned legislators that the bill was a calculated attempt to adversely impact minoritized groups, citing provisions such as the photo ID requirement for absentee

ballots as disproportionately affecting people of color. In addition to public outcry over SB 202, government committees such as the Secretary of State's Bipartisan Task Force for Safe, Secure, and Accessible Elections stated their "concern[s] that the legislative process is proceeding at a pace that does not allow for full examination of all factors that must be considered."

76. On March 22, 2021, Advancing Justice–Atlanta submitted written testimony opposing the restrictions on absentee voting outlined in SB 202, highlighting the harm they would cause to AAPI voters in Georgia. The testimony included data on the high rates of voting by mail within the AAPI community; the already high rates of rejection of absentee ballot applications of AAPI voters; and descriptions of the specific harms that would befall LEP voters and new or first-time voters.

77. Nevertheless, the General Assembly jammed SB 202 through the legislative process without notice to advocates, voters, or, at times, even other legislators. Few non-white legislators—and no AAPI legislators—were involved in the drafting of the bill or able to offer amendments. Ignoring testimony by Advancing Justice–Atlanta and other civil rights and community interest groups, the General Assembly rushed SB 202 through the House and Senate in a process that deviated from common practice. The House passed SB 202 on March 25, 2021 and

immediately transmitted the bill to the Senate without convening a conference committee. The Senate brought the bill to a vote just hours later, over objections by state Senators. What began as a two-page bill had, by then, ballooned into a nearly hundred-page bill with countless provisions aimed to disenfranchise voters of color, including AAPI voters.

78.     On March 25, 2021, Governor Brian Kemp signed SB 202 into law in, quite literally, a closed-door ceremony. State Representative Park Cannon, a Black woman, was arrested and forcibly removed from the State Capitol by state troopers after knocking on Governor Kemp's office door to try to witness the bill signing.

**B.     Impact of SB 202 Provisions on the AAPI Community**

**1.     Restricted Timeframes to Request and Receive Absentee Ballots**

79.     For decades, Georgians have relied on absentee-by-mail voting procedures. Mail-in voting affords voters more time to study the issues and candidates on the ballot; allows vote-casting even when a voter has an inflexible work schedule or other obligations on Election Day; enables voters to comfortably access language assistance; and obviates the need for special transit arrangements to a polling place. Absentee-by-mail voting has been and continues to be a crucial means to advance equitable participation in Georgia's political processes.

80.     Prior to SB 202's enactment, a voter could request an absentee ballot by providing certain basic information, such as the current address at which they are registered to vote, their signature or the signature of the eligible relative requesting the ballot on their behalf, and, if applicable, the signature of the person assisting them. Additionally, before SB 202, voters could request an absentee ballot from 180 days prior to an election through the Friday before Election Day.

81.     In addition, county boards of registrars were previously required to mail absentee ballots to eligible applicants between 45 to 49 days prior to presidential and general primary elections, other than municipal elections, and special elections in which a candidate for federal office appears on the ballot.

82.     SB 202 restricts the timeframes for absentee-by-mail voting in two key ways. *First*, Section 25 of SB 202 delays and compresses the time period during which a voter may request an absentee ballot. Unless a voter is hospitalized, SB 202 reduces the time a voter can request an absentee ballot from 180 days to 78 days prior to an election and requires that the application be received by the county election administrator at least 11 days prior to the election. *Second*, Section 27 of SB 202 delays the issuance of absentee ballots by 20 days; now, the board of registrars need only mail absentee ballots to eligible applicants 25 to 29 days prior to a qualifying election.

83.   By shortening the window in which a voter may request an absentee ballot, and delaying the issuance of absentee ballots to eligible applicants, SB 202 restricts access to absentee-by-mail voting. Such a restriction discriminates against and disproportionately impedes the franchise of AAPIs, who vote by mail at higher rates than any other racial group in Georgia.

84.   During the General Election, AAPI voters relied on absentee-by-mail voting at a rate higher than any other racial group. Approximately 40% of AAPI voters cast absentee-by-mail ballots, compared to the statewide absentee-by-mail voting rate of around 26%. Similarly, during the Runoff Elections, approximately 34% of AAPI voters cast absentee-by-mail ballots, compared to the statewide absentee-by-mail voting rate of around 24%.

85.   AAPI voters, who are more likely to be LEP or first-time voters, often require more time and language assistance to review ballot materials and cast their ballots. This is the case for certain Plaintiffs who required assistance from family members and/or organizations such as Advancing Justice–Atlanta. In the event that the board of registrars or absentee ballot clerk identifies a mismatch regarding records of a voter's identifying information, that voter will, under SB 202, have less time to cure the discrepancy. A reduced timeline to apply for and receive an absentee ballot severely burdens or outright denies AAPI voters the right to vote.

86.     Moreover, historically, Georgia's AAPI absentee-by-mail applicants more often submitted absentee ballot applications in the ten-day period before Election Day, when compared to overall rates of submission of Georgia vote-by-mail applications. Thus, a reduction in the application submission window has a disproportionate impact on their ability to participate in elections. All Georgia voters will be affected by SB 202's limitations on the opportunity to apply for and receive absentee ballots, but the law has a disproportionate, discriminatory impact on AAPI voters.

87.     In light of the current climate of anti-Asian violence and the historical record of threats against people of color in Georgia, AAPIs are disproportionately harmed by the restriction of this voting option. Many AAPIs have been fearful or reluctant to go to the polls or other public places because of the anti-Asian sentiment and outright violence that has escalated and publicly pervaded since the outbreak of the COVID-19 pandemic. The option to apply for and receive an absentee ballot by mail has therefore been an essential means by which AAPIs can vote safely and securely without risking their lives, or enduring harassment or physical violence.

88.     Proponents of SB 202 have failed to identify or offer any concrete facts to support a valid justification for compressing the time frame for requesting an absentee ballot, nor for shortening the window that an eligible voter has to review

absentee ballot materials before the election. According to multiple statements by Governor Kemp, Lieutenant Governor Duncan, Secretary Raffensperger, and former Georgia voting systems implementation manager Gabriel Sterling (current chief operating officer for the Secretary), there was no evidence of widespread vote-by-mail fraud in Georgia, nor has there ever been.

### 2.   Barriers to Access Secure Ballot Drop Boxes

89.   Before SB 202, Georgia voters enjoyed the ability to safely and securely cast their ballots in one of 330 drop boxes in Georgia, most of which were freestanding outside of a building and often accessible 24 hours a day.

90.   Before SB 202, drop box locations were permitted to open as early as 49 days before Election Day, and did not close until 7:00 p.m. on Election Day.

91.   In the 2020 election cycle, counties were required to monitor each drop box through 24/7 video surveillance to ensure security of drop box voting and mandated to retain the video footage for 30 days following certification of an election.  Elections officials were also required to collect ballots from each drop box at least once every 24 hours and complete documentation indicating the time, date, location, and number of ballots collected.

92.   The statewide use of drop boxes in the 2020 election cycle ensured voters had meaningful and continuous access to secure ballot drop-off locations. By

using drop boxes, voters did not have to assume the risk of mail delays but could still avoid the crowds and long lines associated with in-person voting. Drop boxes were and continue to be necessary to providing equitable voting options for Georgia voters, including AAPIs.

93.    SB 202 restricts access to these drop boxes by limiting their locations, mandating they be placed indoors, and restricting their dates and hours of operation.

94.    *First*, Section 26 of SB 202 diminishes the availability of drop boxes to one per county, plus the lesser of one per every 100,000 "active registered voters" in the county or one per advance voting location in the county. This numerical limit severely reduces drop boxes in counties across Georgia, affecting both densely and sparsely populated counties.

95.    *Second*, SB 202 requires drop boxes to be established in the office of the board of registrars or absentee ballot clerk or inside an advance voting location. Only during Governor-declared emergencies may drop boxes be located outside.

96.    *Third*, SB 202 restricts drop boxes to be open only during the hours of operation of a registrar's office or advance voting location, mandating that they otherwise be closed. Also under the newly signed law, advance voting is only required between the hours of 9:00 a.m. through 5:00 p.m. on weekdays and certain weekend days, commencing on the fourth Monday prior to an election and ending

the Friday before Election Day. County registrars *may* in their discretion extend the hours, but only to, at maximum, 7:00 a.m. to 7:00 p.m. This restriction would impact the individual named Plaintiffs who used ballot drop boxes after business hours during the General and/or Runoff Elections.

97.     Indeed, these restrictions disproportionately impose a discriminatory and unnecessary burden on voters of color, including AAPI voters, by reducing safe, convenient, and reliable means to return mail-in ballots in populous, metro counties with significant non-white populations. For example, in Gwinnett County, whose population is approximately 50% non-white and 12.5% AAPI, there were 23 ballot drop boxes during the 2020 election cycle. Under SB 202, that number will dwindle; likely, only six drop boxes will be permitted for a county of over 936,000 residents. Similarly, Fulton County, a county with over one million residents and the second largest AAPI population in the state, offered 36 drop boxes during the 2020 election cycle. But SB 202 would force Fulton County to cut the number of drop boxes to as few as nine.

98.     Proponents of SB 202 have failed to identify or offer any concrete facts to support a valid justification for reducing access to ballot drop boxes. There is no evidence that drop boxes were unsafe, ineffective, or susceptible to voter fraud.

### 3.     Prohibition Against Proactive Mailing of Ballot Applications

99.    In advance of the June 2020 primary election, in the midst of a global pandemic, Secretary Raffensperger authorized the state's mailing of absentee ballot applications to all registered voters in Georgia.

100.    In recent elections, when the state declined to, election officials in Fulton County and DeKalb County opted to mail absentee ballot applications to all eligible voters within county lines. The proactive mailing of absentee ballot applications increased voting access, particularly for AAPI voters, who are more likely to be LEP or first-time voters unfamiliar with processes to request ballots.

101.    Now, Section 25 of SB 202 prohibits all election officials from sending absentee ballot applications except upon the request of a voter or authorized relative. Prohibiting election officials from proactively mailing absentee ballot applications significantly and disproportionately harms AAPI and other LEP voters. To request an absentee ballot, voters must now access and navigate the website of the Secretary of State or their election superintendent and registrar. Since the Secretary of State's website and most county board of elections' websites are available exclusively in English, the application request process is severely burdensome for AAPI LEP voters.

102.    This provision of SB 202 also harms Advancing Justice–Atlanta and other community organizations who engage in GOTV efforts with AAPI

communities. If election officials proactively mailed absentee ballot applications to all eligible Georgia voters, Advancing Justice–Atlanta would not need to devote significant resources to educating voters on how to request absentee ballots and assisting voters in that process.

103.    Proponents of SB 202 have failed to identify or offer any concrete facts to support a valid justification for outright banning state and local election officials from proactively mailing ballot applications to eligible voters. There is no evidence of fraud associated with increased access to applications. Indeed, as has been the case since long before SB 202, ballot applications are subject to a thorough process in order to verify the voting eligibility of the applicant.

### 4.    Additional and Burdensome Identification Requirement

104.    SB 202 also imposes burdensome voter identification requirements for mail-in voting. Specifically, Section 25 of SB 202 newly requires that, when requesting an absentee-by-mail ballot, the voter provide their Georgia's driver's license or Georgia state identification card number, in addition to their registration address and date of birth. SB 202 further demands that a voter who does not have a Georgia driver's license or state ID card instead provide a photocopy or electronic

image of a utility bill, bank statement, government check, paycheck, or other government document containing the name and address of the voter.

105. AAPIs are less likely than white Americans to have state-issued licenses or identification cards, forcing more AAPI voters requesting a mail-in ballot to collect and present by photocopy or electronic image additional information, even after they have already provided unique identifying data. These extra steps add cost and hardship to the voting process and increase the likelihood that an eligible voter will have their ballot application disqualified due to mistakes or confusion regarding these additional procedural requirements.

106. By requiring those who lack state-issued identification to clear additional procedural hurdles to vote by mail, this provision of SB 202 inflicts a substantial burden on voters. That burden falls disproportionately on LEP voters, who are both more likely to be required to provide the additional documentation and more likely to require assistance to understand how to meet the additional identification requirements.

107. Proponents of SB 202 have failed to identify or offer any concrete facts to support a valid justification for imposing this onerous, additional identification requirement. There is no evidence that the prior requirements of registration address,

date of birth, and signature comparison were insufficient to guard against voting fraud.

## CLAIMS FOR RELIEF

### COUNT ONE

**Violation of Section 2 of the Voting Rights Act**
**52 U.S.C. § 10301,** *et seq.*
**(Intentional Racial Discrimination and Discriminatory Results)**

108.   Plaintiffs re-allege and incorporate by reference all prior paragraphs as though fully set forth herein.

109.   Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301(a), prohibits voting laws, policies, or practices that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]"

110.   Section 2 requires a "totality of the circumstances" analysis that includes factors such as:

> the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns;

> and the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Thornburg v. Gingles*, <u>478 U.S. 30, 44</u>-45 (1986). In violation of the rights of Individual Plaintiffs' right to vote and Organizational Plaintiff's right to not be burdened with the expenditure and diversion of limited organizational resources to address discriminatory restrictions on the right to vote, SB 202 (1) restricts the timeframe to request and receive absentee ballots; (2) limits access to secure drop boxes; (3) prohibits election officials' proactive mailing of ballot applications; and (4) imposes burdensome and unnecessary additional identification requirements for requesting absentee ballots.SB 202 violates Section 2 of the VRA because the challenged provisions were adopted for the purpose of denying voters of color full and equal access to the political process.

111.   SB 202 further violates Section 2 of the VRA because, given the totality of the circumstances alleged herein, the challenged provisions, individually and cumulatively, will disproportionately deny voters of color an equal opportunity to participate in the political process and to elect representatives of their choice by denying or abridging their right to vote. Specifically, SB 202 interacts with historical, socioeconomic, and other electoral conditions in Georgia to prevent voters of color, particularly AAPI voters, from having an equal opportunity to participate in the political process on account of their race or color.

## COUNT TWO

**Fourteenth and Fifteenth Amendments**
**U.S. Const. amend., XIV; 42 U.S.C. §1983**
**(Intentional Race Discrimination)**

112.  Plaintiffs re-allege and incorporate by reference all prior paragraphs as though fully set forth herein.

113.  42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

114.  Section 1 of the Fourteenth Amendment to the United States Constitution provides:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

115.  Section 1 of the Fifteenth Amendment to the United States Constitution provides:

> The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

116.   Discriminatory intent may be established by proof that the defendants used race as a motivating factor in their decisions. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

117.   SB 202 violates the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, because it was purposefully enacted and operates to deny, abridge, or suppress the right to vote of otherwise eligible voter on account of race or color.

118.   SB 202 violates the Fifteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, because Defendants intentionally enacted and operate the law to deny, abridge, or suppress the right to vote on account of race or color.

119.   The facts alleged herein reveals that SB 202 was enacted, at least in part, with a racially discriminatory intent to disenfranchise AAPI voters and other voters of color in violation of the United States Constitution.

120.   Georgia's long history and ongoing record of racial discrimination in the context of voting, the known and reasonably foreseeable discriminatory impact of SB 202, the sequence of events and substantive departures from the normal legislative process which resulted in the enactment of SB 202, and the tenuousness

of the stated justifications for SB 202 raise a strong inference of a discriminatory

purpose in violation of the Fourteenth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.      Declare that the challenged provisions of SB 202 violate the

Fourteenth and Fifteenth Amendment to the U.S. Constitution and Section 2 of the

Voting Rights Act's prohibitions on discriminatory purpose;

2.      Declare that the challenged provisions in SB 202 violate the results

prong of Section 2 of the Voting Rights Act;

3.      Enjoin Defendants, their agents, officers, employees, successors, and

all persons acting in concert with them from enforcing or giving any effect to the

challenged provisions of S.B. 202, including enjoining Defendants from

conducting any elections utilizing those provisions;

4.      Award Plaintiffs their costs, expenses, and reasonable attorneys' fees

incurred in the prosecution of this action, as authorized by, *inter alia*, 42 U.S.C. §

1988 and other applicable laws; and

5.      Grant such other and further relief as may be just and equitable.

Respectfully submitted this 19th day of January, 2024.

/s/ Meredyth L. Yoon
MEREDYTH L. YOON
(Georgia Bar No. 204566)
LAURA MURCHIE*
**ASIAN AMERICANS
ADVANCING JUSTICE-ATLANTA**
5680 Oakbrook Parkway, Suite 148
Norcross, Georgia 30093
404 585 8446 (Telephone)
404 890 5690 (Facsimile)
*myoon@advancingjustice-atlanta.org*
*lmurchie@advancingjustice-atlanta.org*

/s/ Eileen Ma
EILEEN MA*
KIMBERLY LEUNG*
**ASIAN AMERICANS
ADVANCING JUSTICE-ASIAN
LAW CAUCUS**
55 Columbus Avenue
San Francisco, CA 94111
415 896 1701 (Telephone)
415 896 1702 (Facsimile)
*eileenm@advancingjustice-alc.org*
*kimberlyl@advancingjustice-alc.org*

/s/ Niyati Shah
NIYATI SHAH*
TERRY AO MINNIS*º
NOAH BARON*
**ASIAN AMERICANS ADVANCING
JUSTICE-AAJC**
1620 L Street, NW, Suite 1050
Washington, DC 20036
202 815 1098 (Telephone)
202 296 2318 (Facsimile)
*nshah@advancingjustice-aajc.org*
*tminnis@advancingjustice-aajc.org*

/s/ R. Adam Lauridsen
LEO L. LAM*
R. ADAM LAURIDSEN*
CONNIE P. SUNG*
CANDICE MAI KHANH NGUYEN*
LUIS G. HOYOS*
RYLEE KERCHER OLM*
NIHARIKA S. SACHDEVA*
ELIZABETH A. HECKMANN*
**KEKER, VAN NEST AND PETERS
LLP**
633 Battery Street
San Francisco, CA 94111-1809
415 391 5400  (Telephone)
415 397 7188 (Facsimile)
*llam@keker.com*
*alauridsen@keker.com*
*csung@keker.com*
*cnguyen@keker.com*
*lhoyos@keker.com*
*rolm@keker.com*
*nsachdeva@keker.com*
*eheckmann@keker.com*

*Attorneys for Plaintiffs Asian
Americans Advancing Justice–Atlanta,
Steven J. Paik, Nora Aquino, Angelina
Thuy Uddullah, and Anjali Enjeti-
Sydow*

*\*Admitted pro hac vice*
*º Not admitted in D.C.*